# W. B. McKINLEY ET AL.
## v.
## C. L. SMITH, RECEIVER, ET AL.

*Corporations—Receiver—Rights of Creditors—Priority—Trust Deed to Secure Bonds—Judgments—Fixtures.*

Upon a bill filed by a stockholder to secure the appointment of a receiver and determine the rights of the creditors of a corporation in order of priority, it is *held:* That certain judgments are entitled to priority, as to the real estate and fixtures, over a trust deed given to secure an issue of bonds which had not been sold; that certain creditors had not accepted bonds in payment of their claims; that the conditions upon which the bonds were to be accepted had failed; that certain of the bonds which were hypothecated are entitled to priority subject only to the prior liens of the judgment; and that, as between the parties, the trust deed will be taken as indicating what are and what are not fixtures.

McKinley v. Smith.

[Opinion filed June 25, 1888.]

APPEAL from the Circuit Court of Champaign County; the Hon. C. B. SMITH, Judge, presiding.

Mr. H. W. BEARDSLEY, for appellants.

Mr. J. L. RAY, for First National Bank and H. H. Harris.

Mr. J. S. WOLF, for Wm. L. Scott.

PLEASANTS, P. J.   The bill herein was filed November 1, 1884, by James R. Scott, a stockholder, against the Champaign Sugar Company, alleging its insolvency and the exposure of its assets to the danger of waste, with particulars justifying the prayer for a receiver, and for the conversion of its means and payment of its creditors, as far as could be made, according to their respective rights.   It was taken *pro confesso* and decree thereon entered, appointing a receiver and referring the cause to a special master to take proofs and report its liabilities in order of priority.   Intervening petitions were filed by the creditors, testimony taken and report made as ordered, on which a final decree was rendered.   The record is brought here on appeal taken by divers of these creditors, the controversy being upon the order of precedence of their respective claims as fixed by said decree.

The business of the company was the raising of sorghum cane and the manufacture of sugar and syrup therefrom.   For that purpose it had rented large tracts of land.   In the spring of 1884 it was heavily indebted, among other things, for rent and for labor done with reference to the coming crop, the benefit of which it was liable to lose for want of means to pay what was due and prosecute the work to the harvest.   About two-thirds of its indebtedness was in the form of notes held by members of its board of directors, respectively, in their individual capacity, namely, Geo. W. Gere, G. C. Willis, Alexander Strong, Geo. F. Beardsley, M. E. Lapham, H. H. Harris, J. B. Arnold and W. B. McKinley.   Harris was cashier

of the First National Bank of Champaign, and held a note of the company for $5,000, payable to him as cashier, and the claim really belonged to the bank, as the directors well knew. It also held a note for $605.24, as assignee of Robinson and Burt, machinists, who had furnished material and performed labor for the improvement and equipment of the company's factory. Among the creditors on open account was John G. Clark, to whom the company owed about $3,000 for cane furnished to it in 1883.

The stockholders having declined to make further advances, and all other means resorted to for raising money having failed, the board of directors, on May 28, 1884, ordered that the president and secretary " issue fifty bonds of $500 each, payable to the bearer, to be dated May 1, 1884, due in five years, bearing interest at six per cent. per annum, and that they also execute and acknowledge a trust deed upon the plant and fixtures and personal property of the company, the bonds to be sold at not less than 92 cents on the dollar and the proceeds to be used in the payment of the indebtedness of the company." It was further provided that the bonds and trust deed should be delivered to a committee of three to be by them delivered to a permanent committee of two, composed of McKinley and Beardsley, who should endeavor to negotiate them. They were prepared and delivered accordingly. J. W. Langley, lately a director and still a small stockholder, being named as grantee in trust in the deed.

On the night of the 29th June, he went east to sell them. There had been some talk among the members of the board, and also by president Gere and by the committee, or one of them, with Clark, about allowing creditors to take these bonds at ninety-two per cent. for their claims; and at a meeting of the board on the evening before, a motion was carried " that those holding notes of the company be permitted to exchange them for bonds at ninety-two per cent. of their face value, and that the committee be instructed to make the exchange.

It is claimed by appellants, and there is evidence tending to show, that at this meeting and after the motion was adopted, Harris, Gere, Willis, Strong and McKinley said they accepted

McKinley v. Smith.

or would accept bonds at that rate for their notes, and told McKinley for what he might sell them on their account; and that Clark also, before then, said to Mr. Gere, and on that night to Beardsley, that he accepted six of these bonds at that rate for his claim, and that McKinley might sell them for what he could get, as low, if need should be, as 85 cents.

It appears, however, that no notes were then surrendered or account receipted, nor were any bonds delivered to or set apart for either of these creditors or for any other; and if these directors then acquired any right, as creditors, to any of these bonds, by virtue of such acceptance, they waived and relinquished it by their action of July 18th following, a hereinafter stated. But a principal question involved is whether Clark thus acquired a right to six of the bonds with the security of the trust deed.

The master found that this arrangement to pay his claim in full with these bonds, if made, was a fraud upon the rights of other creditors, and the Circuit Court approved this finding.

We apprehend this was a mistaken view of the matter. Unquestionably the arrangement mentioned would have been a departure from the original intention, and might have been prejudicial to the interests of other creditors, as contemplated when the bonds and trust deed were ordered to be executed. But it is to be observed that creditors were not parties to the deed nor intended to be. The *cestuis que trust* were the bond-holders. None of the bonds had yet been sold. If they had been the proceeds would have belonged to the company. It could have disposed of them in a manner different from that originally intended, if it saw fit. It might have paid Clark in full, without wrong to other creditors thereby postponed or left unpaid. No disposition of them would have affected the rights of the bondholders—the only parties having any rights under the deed as against the company. So, until sold, the bonds themselves belonged to the company, and for the same reason it could dispose of them in a manner different from that originally intended. It could use them, as it might have used the proceeds, in the payment of a preferred debt or debts. Creditors had no vested right in the original order for the execution and disposition of these securities.

But we reach the same conclusion upon the question of priority of Clark's claim, by finding, as we do from all the evidence, that he did not, in fact, acquire a title to any bonds. While it was testified that he said he accepted six of them unconditionally, we think the proof is that though no condition was expressed, it was his intention and the understanding of the board, that upon the assumption of a sale to be made without delay, he would accept the proceeds of six, to be charged to him at 92 cents on the dollar of their face value, and not that he would take the bonds themselves with the risk of failure to sell them. This risk was not referred to in either of the conversations with him about taking bonds—a fact which indicates that no such thing was contemplated, or at least that it was understood he took none. His claim was due. He had been pressing for his money. He had declined president Gere's proposition to take the company's note bearing interest at eight per cent., because he needed money so much that he would submit to a considerable sacrifice to get it. He knew the company was embarrassed. It was not probable, therefore, that he would take the risk of holding them five years, with interest at six per cent., for the chance of selling them in New York or elsewhere even at 85 cents. The understanding with him was the same as that with the note-holding directors—that the bonds were to be sold without delay, if possible, in which case they would take the proceeds of so many as would pay their respective claims at 92 cents, whatever those proceeds might amount to. No bonds were delivered or set apart to either of them, no note was surrendered or credit given by either of them. It was all upon condition that the bonds would be sold for not less than the rate agreed on. The bank held judgment notes for over $6,000. Harris represented it, as cashier. It is not a bank's or cashier's way to surrender such claims for five year bonds bearing six per cent. interest if there is doubt about making sale of them. And as Harris did, and intended, so did they all.

McKinley took the bonds to New York but failed to effect a sale at any price. A like effort was made in Chicago with a like result. He returned on the 15th or 16th of July, bring-

ing back the bonds and reporting his failure.   The arrangement intended for the payment of these note-holding directors and Clark was thus ineffectual, and therefore abandoned, at least, for a time.   At a meeting of the board on the evening of the 17th, it was proposed by the committee to hypothecate sixteen of these bonds at fifty per cent. of their face value, to secure loans for six months to meet their pressing necessities.   Harris opposed this proposition, not because the original scheme was not a recognized failure, but because this would not, in his opinion, be dealing honorably with the other creditors.   He thereby, in effect, gave notice to the board that though a majority vote in its favor might bind him as a member, neither the bank, nor he, as its agent, would be a party to, or bound by it.   If they proceeded to adopt it, they would do so subject to his and its right to avail themselves of all lawful means for the security of their claims.   The meeting lasted until after midnight and the proposition was then defeated.   At another, however, held on the afternoon of the next day, in the absence of Harris and two other members, the motion was renewed by Beardsley and carried, with the further provision "that the bonds remaining in the hands of the committee, after taking out the $8,000, and except such as had been sold, if any had been sold, be held for all of the creditors of the company at July 18th, and that if any sales be made the amount realized on the same be paid *pro rata* to such creditors."   This would seem to show, and it is admitted, that the directors who held notes were not then claiming, for themselves or against any other, that they had title to any of the bonds and that their notes were thus paid.   It shows, further, they did not understand that any had been sold to Mr. Clark and the debt to him thereby paid.   Clearly they did not propose to insist that he should be charged with them at 92 cents.   This motion was made by Beardsley, who testified to Clark's unconditional acceptance in June, and yet it was manifestly intended to let him determine, now that the attempt to make a sale had failed, whether it was or was not intended to be conditional upon the success of that attempt.

For these reasons, we think, it was so intended by him and understood by the board.

In the forenoon of the 18th of July, after this discussion and temporary defeat of the plan of hypothecation, and before the proposition was renewed and carried and also before the trust deed was filed for record, Harris took judgment by confession against the company in favor of himself and of the bank, respectively, upon the judgment notes before mentioned. The master regarding all the creditors whose claims accrued before May 28, 1884, as *cestuis que trust*, treated these judgments as subject to the lien of the deed, because Harris, and the bank through him, had actual notice of it, but the Circuit Court held them to be the prior liens upon the real estate and fixtures.

For the reasons already given we concur with the court upon this point. If the experiment contemplated by the deed or by any plan for the disposition of the bonds or their proceeds to which Harris had agreed or submitted, had been still pending, good faith would have forbidden the taking of these judgments. But no rights had become vested under the deed. Nobody had taken or was expected to take a bond upon any terms that had been prescribed. The absolute necessity of some further and material modification of those terms or of resorting to some other method for raising means, was fully recognized. Neither the bank nor any other creditor, though advised of what had been proposed and attempted by the board, was bound to wait indefinitely for further experiments, but was at liberty to proceed as if no deed had been made.

No execution having been issued thereon these judgments were not liens upon the personal property described in the deed. Question is made as to what was personal property and what fixtures. Consisting of machinery used in connection with the building, it is difficult for us to determine, from the evidence in the record describing the several items, how to classify them. We are inclined to think the master's findings in reference to them, approved and adopted by the decree, were not correct in some instances—the fanning mill, for example, and perhaps others. But we see no inequity in holding everything as personalty that was declared by the deed to be such, as against the judgments, not because the deed is at

all operative as an incumbrance prior to the judgments, but because Harris had thereby recognized those articles and machines as personal property. The intention of the board, thus manifested, to treat them as such, ought certainly to be regarded as a very weighty, if not a controlling, circumstance in fixing their character.

The sixteen bonds having been hypothecated upon the security of the trust deed, in pursuance of the resolution of the board, the holders of those bonds should have the benefit of that security, subject only to the prior liens of the judgments, that is, should be first paid out of the proceeds of the real estate and fixtures remaining, if any there shall be, after payment of the judgments, and first of all out of the proceeds of the personal property. They have the first lien upon the latter, and the next after the judgments upon the former.

Except as above indicated to the contrary, the decree of the Circuit Court will be affirmed.

Affirmed in part, reversed in part, and remanded, with directions to modify the decree in accordance with this opinion.